UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **WILLIAM PHILIP WAGNER,** ) | **Case No. 11-10853 HRT** |
| ) | **Chapter 7** |
| **Debtor.** ) | |
| ) | |
| ) | |
| **MARTIN J. WAGNER,** ) | **Adversary No. 11-1233 HRT** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **WILLIAM PHILIP WAGNER,** ) | |
| ) | |
| **Defendant.** ) | |

### ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT

This case comes before the Court for trial of Plaintiff's *Verified Second Amended Complaint for Determination of Nondischargeability of Debts under 11 U.S.C. § 523 and Objection to Discharge under 11 U.S.C. § 727* (docket #26).

Plaintiff's Second Amended Complaint seeks judgment against the Defendant finding that he owes a nondischargeable debt to the Plaintiff on account of fraud under 11 U.S.C. § 523(a)(2)(A) and on account of willful and malicious injury under 11 U.S.C. § 523(a)(6). In addition, the Second Amended Complaint states causes of action against the Defendant for denial of discharge under 11 U.S.C. § 727(a)(4)(A) for allegedly concealing assets in his bankruptcy case and under 11 U.S.C. § 727(a)(5) for failing to explain a loss of assets.

The Court held a trial of this matter on June 25 & 26, 2012. Thereafter, the parties provided written closings. The Court has considered the evidence presented at trial as well as the arguments of the parties.

### I. FACTUAL BACKGROUND

1. Defendant William Philip Wagner (hereinafter Defendant or William) is the Debtor in Case No. 11-10853 HRT, filed under chapter 7 on January 18, 2011. Subsequent to the filing of his voluntary bankruptcy petition, Defendant changed his name to William McDonough, however, with respect to the events relevant to this matter, the Defendant was at all times known as William Philip Wagner.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

2. Plaintiff Martin J. Wagner (hereinafter "Plaintiff or Martin") is the Defendant's father.

3. Plaintiff owns a parcel of property with a cabin (the "Cabin") located at 725 County 5 NW, Hackensack, MN 56452.

4. In the spring of 2004, Defendant discussed with Plaintiff his desire to obtain a loan using Plaintiff's Cabin as security for the loan.

5. When Plaintiff and Defendant were in discussions concerning the loan, Defendant represented to Plaintiff that he intended to sell his home in Forest Lake, Minnesota, and use $100,000.00 of the equity from the sale to reduce the balance of the proposed loan. This finding is disputed but the Court found the Plaintiff to be the more credible on this point.

6. At the time Defendant represented to the Plaintiff his intent to use $100,000.00 of equity from the sale of his Forest Lake home to reduce the balance of the proposed loan, Defendant knew, but did not disclose to the Plaintiff, that a sale of his home was pending. That sale closed on June 29, 2004.

7. Plaintiff authorized the use of his Cabin as collateral for the proposed loan.

8. On or about June 25, 2004, Debtor and Debtor's ex-wife Michelle Kuznia, f/k/a Michelle Weiss, ("Kuznia") executed a promissory note known as Loan Number 801382 in the amount of $194,000.00, in favor of Lake Area Bank (the "Cabin Loan"). The Cabin Loan was secured by a deed of trust encumbering the Plaintiff's Cabin.

9. The disclosure statement dated June 25, 2004, produced in connection with closing of the Cabin Loan, details where the Cabin Loan proceeds were to be disbursed:
   a. Amount paid to Borrower directly:
      i. $104,537.27 to be credited to Loan #800852;
      ii. $3,000.00 deposited to Checking Account No. 2251209;
      iii. $20,000.00 deposited to Checking Account No. 2251209;
      iv. $374.95 deposited to Checking Account No. 2251209.
   b. Amount paid to others on Borrower's behalf:
      i. $53,235.00 to Twin Cities Featherlite;
      ii. $8,991.58 to First National Bank of Walker.
   c. The remaining $3,861.20 was used to pay miscellaneous closing costs and prepaid finance charges.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

10. Loan Account No. 800852 (Loan #800852) was a loan made to the Defendant and Kuznia by Lake Area Bank and at least partially secured by their home in Forest Lake, Minnesota. The full balance of Loan #800852 was paid off from proceeds of the Cabin Loan.

11. Four days later, the sale of the Forest Lake home owned by the Defendant and Kuznia closed. The settlement statement from that sale details the disbursements made from the proceeds of that sale:
   a. $355,000.00, Gross sale price
   b. $15.56, refund to sellers of pro-rated taxes
   c. $258,071.83, Wells Fargo first mortgage pay-off
   d. $67,400.00, to be credited to Loan #800852.[1]
   e. $3,016.50, settlement costs
   f. $472.41, water and sewer charges
   g. $26,054.82, net cash to sellers

12. The Court finds that, following the closing of the sale of the Forest Lake home, Defendant had realized cash proceeds from the Cabin Loan of at least $23,374.95 and that he realized cash proceeds from the sale of the Forest Lake home of at least $93,454.82.[2] In total, Defendant received no less than $116,829.77 in cash proceeds from the two transactions.

13. Defendant did not use any proceeds of the sale of the Forest Lake home to pay down the balance of the Cabin Loan.

14. The Court finds, by a preponderance of the evidence, at the time he represented to the Plaintiff his intent to use $100,000.00 to reduce the balance on the Cabin Loan after selling his Forest Lake home, the Defendant lacked the present intent to do so.

---

[1] This is the balance on Loan #800852 as of the refinancing that took place on July 31, 2002. Two subsequent refinancings of that loan increased the balance up to $104,137.94 as of March 10, 2004. Defendant directed $104,537.27 of the Cabin Loan Proceeds to be applied to Loan #800852 from the Cabin Loan closing on June 25, 2004. Four days later, upon the sale of the home in Forest Lake, another $67,400.00 was applied to Loan #800852 from that transaction.

[2] The settlement statement from the sale of the Forest Lake home indicates cash to the seller of $26,054.82. To that figure, the Court has added $67,400.00 shown as being applied to the second mortgage loan at Lake Area Bank because that obligation was fully paid four days earlier from proceeds of the Cabin Loan.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

    15.    The Plaintiff sued Defendant and Kuznia in Minnesota state court. In that case, the Defendant entered into a settlement agreement. As part of the settlement, Defendant executed a promissory note in favor of the Plaintiff in the amount of $195,000.00 and promised to refinance the Cabin Loan to remove the encumbrance against the Plaintiff's Cabin. The Defendant did not perform under the settlement agreement and judgment ultimately entered against him and in favor of the Plaintiff for $261,734.94.

## II. DISCUSSION

### A. Defendant Credibility

The overriding impression the Court is left with after hearing the Defendant's testimony is that he is an individual who will say virtually anything the situation seems to require. Rarely, it seemed, was he capable of giving a straight answer to a simple question. The following exchange, which occurred between Plaintiff's counsel and the Defendant, is typical.

Counsel: What was the purpose of the loan?
Defendant: What I have testified is that there were many versions of many agreements. My father testified to this also. It was to consolidate debt [unintelligible] evidence; it was to purchase a . . . 2000 Featherlight horse trailer; it was never to purchase the home. I gave him a $40,000.00 down payment or payment made through his emergency fund but I've never said it was to purchase the home. Never.
Counsel: You testified earlier that you didn't need this loan to purchase the Featherlight; correct?
Defendant: I did not. Once that second mortgage was paid off, I have what – twenty-eight thousand encumbered with vehicles I would have to take out a separate vehicle loan for. That wasn't an issue. And I was working in 2004 making six figures. Even with my bad credit, I would have been fine.
Counsel: So why didn't you purchase the Featherlight directly?
Defendant: Because my dad needed money.
Counsel: Why didn't you take out a $40,000.00 loan by itself?
Defendant: Because you can get a lot better interest rate on a mortgage as opposed to a vehicle securing debt. I'm sorry, I don't mean to be . . .
Counsel: No, I understand. But, if the purpose of this loan was to benefit your father, for $40,000.00 why wasn't a mortgage for $40,000.00 taken out?
Defendant: You know, it's interesting because in his deposition he mentioned that the loan was originally talked about as $150,000.00.
Counsel: Mr. McDonough, I'm asking you what your understanding was, not what my client has testified to.
Defendant: I feel like you're putting words into my mouth and telling me I testified to these things when I have not. Never have I said that loan was to purchase a cabin.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

Counsel: My question, Mr. McDonough was why did you not take out a $40,000.00 loan if that was the purpose?

Defendant: There was no single purpose of the loan. There were multiple purposes of the loan.

That exchange started with a really simple question. Another example of Defendant's propensity to tell whatever "truth" suits his particular purpose at any given moment was given in the testimony of an attorney Plaintiff hired to collect the judgment debt Plaintiff obtained against the Defendant in Minnesota. Upon being served with papers in Colorado, Defendant contacted Plaintiff's counsel and lied about his income and ability to make payments on the judgment debt. Upon cross-examination by Defendant's counsel, Defendant made the point that the he was not under oath when he lied to Plaintiff's collection counsel – as if that is a distinction that should count in his favor.

The result of the Court's observations of the Defendant on the witness stand and the Court's assessment of his credibility is that the Court can have no confidence in any of the Defendant's testimony. The consequence of that assessment is that, whenever other evidence contradicts the Defendant's testimony and the Defendant's credibility on a particular point is put at issue, the Court has given credence to the contradictory evidence absent other factors causing the Court to question it's veracity.

B. Nondischargeability under 11 U.S.C. § 523(a)(2)(A) on Account of Fraud

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>  . . .
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . ..

11 U.S.C. § 523(a)(2)(A). The elements that the Plaintiff must prove, by a preponderance of the evidence, in order for the Court to hold that the Defendant's debt is nondischargeable under § 523(a)(2)(A) on account of a false representation are:

1. that the Defendant made a false representation;
2. that the Defendant made the false representation with the intent to deceive the Plaintiff;
3. that the Plaintiff relied on Defendant's false representation;

Page 5 of 17

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

    4.        that Plaintiff's reliance was justifiable; and

    5.        that the Defendant's false representation caused the Plaintiff to sustain a loss.

*In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009).

    *1) The Defendant Made a False Representation*

From the facts in evidence, the Court finds that, during their discussions concerning the Cabin Loan, the Defendant made the representation to the Plaintiff that he would market and sell his Forest Lake home and use $100,000.00 of the equity from that transaction to reduce the balance on the Cabin Loan. This is strenuously denied by the Defendant but the Court finds the Plaintiff's version of the conversation to be more credible. At the time the Defendant made the statement to the Plaintiff, he did not have $100,000.00 equity in the Forest Lake home and he knew it.

At the time of Defendant's conversation with the Plaintiff concerning the Cabin Loan, he already had a sale of the Forest Lake home pending. The closing statement from that sale shows only $26,054.82 to be paid to the Defendant and Kuznia after paying off both the first and second mortgages and clearing the smaller liens against the property. Defendant may not yet have been in possession of that closing statement and may not have known the exact numbers. He certainly knew the sale price and he certainly knew the approximate amounts of the mortgages. He could not have believed that he had $100,000.00 of equity in that home or anything close to that number.

The picture is complicated by the fact that, prior to the June 25, 2004, closing on the Cabin Loan, Defendant and Kuznia owed $104,537.27 to Lake Area Bank on Loan #800852. That loan was partially secured[3] by the Forest Lake home but the full $104,537.27 was paid from the proceeds of the Cabin Loan. When the sale of the Forest Lake home closed – just four days later – that second mortgage had been paid off and the figure of $67,400.00 appearing on the closing statement for the sale of the Forest Lake home to pay off the second mortgage was no longer necessary for that purpose. As a result, Defendant and Kuznia eventually received both the $26,054.82 figure reflected on the closing statement as well as the $67,400.00 that was no longer necessary for payment of the second mortgage. The end result is that, even though Defendant did not have $100,000.00 equity in the Forest Lake home at the time of his discussions with the Plaintiff, by the time the sale of the Forest Lake home closed he did clear proceeds of $93,454.82 – something close to that $100,000.00 figure.

---

[3] From the fact that the closing statement from the sale of the Forest Lake home shows $67,400.00 from the sale proceeds to be used to pay the second mortgage, the Court infers that amount represents the portion of Loan #800852 secured by Lake Area Bank's second deed of trust against that residence.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

Viewing the Defendant's statement in the most charitable possible light, the Court could construe his statement as recognizing that, as a result of both the Cabin Loan transaction and the sale of the Forest Lake home, he would be in possession of over $100,000.00 and be in a position to pay down the Cabin Loan as promised.

As a general matter, statements concerning future events can less often be found to be a basis for a finding of a misrepresentation than a statement that misrepresents a present fact. In the normal course of events, the failure to perform a future obligation as promised is a mere breach of contract. However, when a promise of future performance is made by one who has no present intention of performing the promise, it is a misrepresentation that may be found to be fraudulent. RESTATEMENT (SECOND) OF TORTS § 530 (1977). *See also In re Kukuk*, 225 B.R. 778, 785-86 (B.A.P. 10th Cir. 1998).

The Court does not infer the Defendant's lack of intention to pay down the Cabin Loan as promised from the mere fact that he failed to perform his promise. *See Justheim Petroleum Company v. Hammond*, 227 F.2d 629, 637 (10th Cir. 1955) ("A lawful inference of . . . deceitful intent may be drawn only from established facts."). The Court cannot know the Defendant's intention by looking into his mind. The Court must, instead, infer the Defendant's intent from the surrounding facts and circumstances. *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996) ("[T]he debtor's intent to deceive the creditor in making false representations to the creditor, may be inferred from the totality of the circumstances . . ..") (citations and quotation marks omitted).

The evidence established that, at the time the Defendant stated to the Plaintiff that he intended to reduce the Cabin Loan balance by $100,000.00 by marketing and selling his home in Forest Lake: 1) he had already made a deal to sell the home that was scheduled to close on June 29, 2004; 2) he did not disclose the pending sale to Plaintiff at the time of their discussions; and 3) after the closing of both the Cabin Loan and the sale of his Forest Lake home, the Defendant had over $100,000.00 in hand and had the ability to perform his promise.

The Court is persuaded that Defendant lacked the present intent to honor his promise to reduce the loan balance after the sale of his home primarily because he withheld the information from the Plaintiff that the sale of his home was already pending and because of the very short time between his discussion with the Plaintiff about the Cabin Loan and the sale of the Forest Lake home. If the Court were to assume that, at the time of their discussions, the Defendant intended to pay down the balance of the Cabin Loan after the closing of his sale transaction, the Court can find no rational explanation for taking out a loan in the amount of $194,000.00 one day with the intention of paying it down by $100,000.00 out of the proceeds of a transaction scheduled to occur just four days later. This is not a promise that was made and later breached because of a change of circumstances. All of the facts and circumstances concerning the promise were known to the Defendant but withheld from the Plaintiff and the Defendant had every ability to perform as promised. At the time Defendant stated that he would reduce the

Page 7 of 17

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

balance of the Cabin Loan by $100,000.00 after the sale of his Forest Lake home, he had no intention of doing so.

### 2) *The Defendant Intended to Deceive the Plaintiff*

Intent to deceive "may be inferred from the totality of the circumstances." *In re Young*, 91 F.3d at 1375 (quotes and citations omitted). Because the Court finds that the Defendant's misrepresentation was made knowingly and deliberately, the Court infers that the Defendant did so with the intent to deceive the Plaintiff. *See, e.g., Wagnon v. State Farm Fire and Cas. Co.*, 146 F.3d 764, 771 (10th Cir. 1998) ("[S]o long as the Mr. Wagnon's misrepresentations were made knowingly and deliberately, the intent to deceive the insurer will be implied.").

The Defendants' misrepresentation was not negligent or the result of carelessness. The evidence is clear that the Defendant knew all of the facts relating to his ability to perform his promise upon the sale of his home. He knew that, in fact, he would be fully able to reduce the balance of the Cabin Loan just as he had promised. The only thing lacking was his intent to perform the promise. The Court finds that Defendant made his representation with the intent to deceive the Plaintiff.

### 3) *The Plaintiff Relied on the Defendant's Promise*

The Defendant presented his purpose in seeking to take out the Cabin Loan as, in part, to consolidate some of his debts. This was presented as a temporary need that would be addressed upon the sale of the home in Forest Lake when the loan balance could be substantially reduced. Even though the Cabin Loan was to be taken out in the amount of $194,000.00, it would be reduced to less than half that figure upon the sale of the Defendant's home in Forest Lake. Another part of the Cabin Loan was to benefit the Plaintiff. He received $45,000.00 from the Defendant which was paid from the proceeds of the Cabin Loan. Various and conflicting explanations are advanced to explain the fact of the payment and the amount. The explanations are largely irrelevant. The operative fact is that Plaintiff did receive the funds and did directly benefit from the Cabin Loan.

The Plaintiff's reliance is limited by the nature of the Defendant's misrepresentation. The misrepresentation did not go to the entirety of the Cabin Loan. It was specific. The misrepresentation goes only to the intention to pay down the balance by $100,000.00 upon the sale of his home. The evidence does not support the contention that, absent the promise, he would not have pledged his Cabin as collateral at all. Rather, the Court finds that, absent the Defendant's promise, Plaintiff would not have allowed the Cabin to be pledged as collateral for the full $194,000.00 Cabin Loan but would have allowed the Cabin to secure a loan for $94,000.00 instead.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

### 4) The Plaintiff's Reliance Was Justifiable

Justifiable reliance is not a high standard. But, here the statement relied upon by the Plaintiff contains elements of both the Defendant's *opinion* of the value of the Forest Lake home and his *intention* to perform a promise to pay down the Cabin Loan in the future. Both of these require a closer examination than when the alleged reliance is upon a statement with respect to a present fact.

### a) Justified Reliance on an Expression of Opinion

As a general matter, the recipient of a statement of opinion is rarely justified in taking action in reliance on that opinion. However, when that statement of opinion is accompanied by special circumstances, reliance may be justified. According to the Restatement,

> The recipient of a fraudulent misrepresentation solely of the maker's opinion is not justified in relying upon it in a transaction with the maker, unless the fact to which the opinion relates is material, and the maker
> (a) purports to have special knowledge of the matter that the recipient does not have, or
> (b) stands in a fiduciary or other similar relation of trust and confidence to the recipient, or
> (c) has successfully endeavored to secure the confidence of the recipient, or
> (d) has some other special reason to expect that the recipient will rely on his opinion.

RESTATEMENT (SECOND) OF TORTS § 542 (1977).

Defendant's ownership of the home in Forest Lake takes his opinion of his equity in the home outside of the general rule that reliance on expressions of opinion are rarely justified. This principle is so well established that, in the courts, owners of real property are considered competent to testify as to their property's value. *Denver Urban Renewal Authority v. Berglund-Cherne Co.*, 568 P.2d 478, 483 (Colo. 1977) ("In Colorado, the general rule is that a property owner may testify as to his opinion of the value of his own property."). *See also Albuquerque v. Ackerman*, 482 P.2d 63, 65 (N.M. 1971) ("An owner of real property is presumed to have special knowledge as to its value by reason of ownership . . .."). Because the law presumes that a property owner has special knowledge concerning the value of his property, the Plaintiff was justified in his reliance on that aspect of his representation.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

### b) *Justified Reliance on a Statement of Intent*

"The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out." *In re Kukuk*, 225 B.R. 778, 785 (B.A.P. 10th Cir. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 544 (1977)). The Court finds the Defendant's representation that he would reduce the balance of the Cabin Loan upon the sale of his home to be material. It makes the difference between the Plaintiff pledging his Cabin as collateral for indebtedness of $94,000.00 as opposed to $194,000.00. Not only does the Court accept the Plaintiff's evidence that Defendant's promise made a difference to him, the Court finds that any reasonable person would find that a $100,000.00 difference in the ultimate encumbrance to be placed on a piece of real property makes a very material difference.

The question remains whether the Plaintiff had reason to believe that the Defendant would carry out his promise. The reasonableness of Plaintiff's reliance on Defendant's statements is supplied by the familial relationship.

In *In re Young*, 208 B.R. 189 (Bankr. S.D. Cal. 1997), the Court analyzed the reliance element. In that case, the plaintiff's sister and brother-in-law pitched a real estate investment deal and assured the plaintiffs that their investments, which would pay 20% interest, would be secured by deeds of trust on real properties. The court found that, even though it may have been unreasonable for the plaintiff's to rely on such a solicitation from a stranger, "[u]nder the circumstances . . . in which family members approached them unsolicited, the reliance of [the plaintiffs] upon the munificence of Debtors, people with whom they had close, even family, relationships was reasonable." Reliance here is even more justified. In *Young*, any investor should have been wary of a 20% return. Here, the Plaintiff had every reason to believe the Defendant's representation that he had sufficient equity in his home to reduce the balance of the Cabin Loan by $100,00.00 upon the sale of the home. Because the information about the pending sale of the home was withheld from the Plaintiff, he had no reason to doubt the Defendant's intention to perform his promise.

Also, the Plaintiff testified that, at the time he agreed to the Cabin Loan, his relationship with the Defendant was a good one and that, at the time, he felt closer to the Defendant than he did to his other children. Under these circumstances, the Court finds that the Plaintiff had good reason to rely on the good faith and truthfulness of the Defendant's stated intention to pay down the Cabin Loan with equity received from the sale of the Forest Lake property.

### 5) *The Plaintiff's Reliance on Defendant's Misrepresentation Caused Him to Sustain a Loss*

The Defendant defaulted on the Cabin Loan. Because the loan was secured by Plaintiff's Cabin, the Lake Area Bank looked to its collateral to satisfy the debt. As a consequence,

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

Plaintiff was obliged to either satisfy Defendant's debt on the Cabin Loan or allow Lake Area Bank to foreclose its security interest in the Cabin.

The Court finds, however, that the full consequences of the Defendant's default on the Cabin Loan were not caused by the Defendant's fraud. His fraud related only to the promise to pay down the Cabin Loan by $100,000.00 following sale of his home in Forest Lake. Thus, the Plaintiff's fraud damages are limited to $100,000.00 plus interest from the date of default.

The Court will use interest rates in effect under the various notes secured by the Cabin – the original Cabin Loan and the Plaintiff's subsequent refinancings. The Court finds interest due as of the date of this order is $48,126.03. Interest is calculated at the original Cabin Loan rate of 6% per annum from June 1, 2005, the stipulated date of default, through August 17, 2009, the date prior to the first refinancing. The first refinancing rate of 10.45% will run through June 15, 2010, one day prior to the second refinancing. The second refinancing rate of 4.95% will run from June 16, 2010, to the present and will be the rate of continuing interest reflected in the Court's Judgment.

C. Nondischargeability under 11 U.S.C. § 523(a)(6) on Account of Willful and Malicious Injury

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity

11 U.S.C. § 523(a)(6).

The bar to discharge in 11 U.S.C. § 523(a)(6) only acts to bar the discharge of injuries caused by intentional torts and not injuries caused by negligence. In the seminal case of *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Supreme Court addressed that very issue. In that case, the plaintiff had sought medical treatment for an injury to her foot but suffered an amputation of her leg due to the defendant's medical malpractice. She sought to have the defendant physician's liability for her injury declared nondischargeable in his bankruptcy proceeding under § 523(a)(6). Because liability for medical malpractice is premised on negligent or reckless conduct, the Eighth Circuit Court of Appeals found that discharge of the defendant's liability was not barred by § 523(a)(6)'s prohibition of discharge for debts incurred through "willful and malicious injury." The Supreme Court affirmed. *Id*. at 60. *Geiger* stands for the principal that to establish the willfulness element under § 523(a)(6) "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id*. at 61. The actor must "intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id*. at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

Page 11 of 17

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

"Willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property. Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that the conduct will cause particularized injury." *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999).

The malice prong of 11 U.S.C. § 523(a)(6) is satisfied upon a showing the injury was inflicted *without just cause or excuse. See, e.g., Kuhn v. Driver (In re Driver)*, 305 B.R. 266, 268 (Bankr. N.D. Tex. 2003); *Johnson v. Wood (In re Wood)*, 303 B.R. 370, 373 (Bankr. C.D. Ill. 2003); *Beckett v. Bundick (In re Bundick)*, 303 B.R. 90, 109 (Bankr. E.D. Va. 2003); *Neshewat v. Salem (In re Salem)*, 290 B.R. 479, 485 (S.D. N.Y. 2003); *McAlister v. Slosberg*, 225 B.R. 9, 21 (Bankr. D. Me. 1998).

In *Geiger*, the Supreme Court set the bar higher than simply finding that liability on an intentional tort is nondischargeable under § 523(a)(6). That distinction was highlighted by the Tenth Circuit Court of Appeals in the case of *Panalis v. Moore (In re Moore)*, 357 F.3d 1125 (10th Cir. 2004). In that case, the Tenth Circuit applied the holding in *Geiger* to the severe injuries suffered by the plaintiff, an oil field contractor employed by the defendant's company. In a state court trial, the defendant was found liable for fraud and a judgment in excess of $6 million was entered in the plaintiff's favor. After the defendant filed his bankruptcy case, the plaintiff sought to have the judgment excepted from discharge under § 523(a)(6). The defendant's fraud was his misrepresentation to the plaintiff that he maintained insurance that would cover him. Because fraud is an intentional tort, the district court held the debt to be nondischargeable. But the Tenth Circuit reversed and discharged the debt. The Court quoted the Supreme Court, observing that "§ 523(a)(6) pertains to 'only acts done with the actual intent to cause injury' and 'non-dischargeability takes a deliberate or intentional *injury* not merely . . . a deliberate or intentional *act* that leads to injury.'" *Id*. at 1128 (quoting *Geiger*, 523 U.S. at 61). It found that the State Court jury verdict established that the defendant's intent was to deceive the plaintiff but not to *injure* him. *Id*. at 1129.

The Plaintiff bases his request for nondischargeability under 11 U.S.C. § 523(a)(6) on virtually the entire relationship between the parties from the time they began discussing the Cabin Loan up until the Defendant filed his bankruptcy petition. Grounds asserted include the Defendant's misrepresentation of his intent to reduce the Cabin Loan balance upon the sale of his home; the Defendant's default in the repayment of the Cabin Loan; the Defendant's non-performance of a subsequent stipulated settlement in the Plaintiff's state court lawsuit against him; and Defendant's various subterfuges to avoid payment of Plaintiff's state court judgment.

Here, the primary harm to the Plaintiff derived from the Defendant's default in repayment of the Cabin Loan. The Defendant took out the Cabin Loan in June of 2004 and the parties stipulate that he defaulted under that loan approximately one year later. At the time that Defendant defaulted on payment of the Cabin Loan, he had been laid off from his employment

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

and was experiencing marital difficulties. The fact that the Defendant made the payments on the Cabin Loan for a year after incurring the debt is evidence of his intent to honor his commitment on the Cabin Loan even if, as the Court has found, he lacked the intent to abide by the promise he made to the Plaintiff to reduce the loan balance by $100,000.00 after the sale of his home.

      The Defendant breached his obligations under the Cabin Loan promissory note. A consequence of that breach was that the lender on the Cabin Loan threatened to foreclose its deed of trust on the Plaintiff's Cabin. There is certainly evidence that a great deal of animus developed between the Plaintiff and the Defendant. The police were summoned to the Cabin as a result of an argument between the two and Plaintiff accused the Defendant of stealing one of his vehicles. But the evidence is that the animosity between the two developed following the default and, arguably, as a result of it; not the other way around. The evidence does not support a finding that Defendant defaulted on the Cabin Loan out of a motivation to inflict willful and malicious injury upon the Plaintiff. The evidence is far more consistent with a finding that the immediate reason for the default was the Defendant's personal and economic situation at the time he defaulted and not his intention to inflict harm on the Plaintiff.

      Other grounds for nondischargeability under § 523(a)(6) are more plausible, such as the allegation that Defendant fraudulently induced the Plaintiff to enter into a stipulated settlement of the state court lawsuit; that he fraudulently induced the Plaintiff's collection counsel to forebear collection efforts; or fraudulently concealed assets in connection with his efforts to avoid the Plaintiff's collection activity. Yet, even if one or more of those theories meets the *Geiger* standard for a willful injury, the Plaintiff's evidence gives the Court no guidance on damages. For example, if a debtor wrongfully evades a judgment creditor's collection activity, the resulting damages are tied to the recovery denied to the judgment creditor by the debtor's wrongdoing, not the entirety of the judgment debt. The evidence in the record is insufficient to allow the Court to make damages determinations with respect to Plaintiff's theories absent pure speculation on the Court's part. The evidence does not allow the Court to find a nondischargeable debt under 11 U.S.C. § 523(a)(6).

D. Denial of Discharge under 11 U.S.C. § 727(a)(4) on Account of Making a False Oath or Account

      The court shall grant the debtor a discharge, unless–
  . . .
      (4) the debtor knowingly and fraudulently, in or in connection with the case–
          (A) made a false oath or account . . ..

11 U.S.C. § 727(a)(4)(A).

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

"In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290 (10th Cir. 1997). Omissions of assets from schedules and statements may constitute a false oath under § 727(a)(4), *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990), to establish liability under § 727(a)(4), "the false oath must relate to a material matter and must be made willfully with intent to defraud." *Id*.

### *1) The Premier Members Federal Credit Union Account*

For some years prior to his bankruptcy filing, the Defendant and Maureen McDonough, his current wife, lived together at her home in Berthoud, Colorado. They were married in 2011, following the Defendant's filing of his bankruptcy case.

Plaintiff argues that the Defendant failed to disclose his interest in a banking account at Premier Members Federal Credit Union (the "Premier Account") that, on the petition date, was held solely in the name of Maureen McDonough. The Defendant was a co-owner of the Premier Account from February of 2010 to June of 2010 when he removed his name from the account title. Plaintiff argues that the Defendant maintained an equitable interest in the Premier Account and that it was required to be disclosed on the Defendant's bankruptcy schedules.

The Court's review of Premier Account statements reveals that, subsequent to removing his name from the account, the Defendant regularly deposited payroll checks into the Premier Account. The account statement entries tie only a few subsequent expenditures directly to the Defendant, such as payment of his toll-road expenses for his commute to Aurora. The Court finds, however, that many of the other expenditures, such as utility expenses, represent customary joint living expenses of both Maureen and the Defendant. Despite removal of his name from title to the account, the Defendant continued to have an equitable interest as co-owner of the account because it contained his funds as well as Maureen's. He continued to deposit his payroll checks into the account and those funds continued to be used to defray his living expenses. The evidence persuades the Court that, at all times following the removal of his name from the Premier Account, up until the Defendant's filing of his bankruptcy petition, the Defendant used the Premier Account as a joint banking account with Maureen McDonough.

From the evidence adduced at trial, the Court finds that the Defendant's purpose for removing his name from the Premier Account was to frustrate creditor collection activity. The Defendant's fraudulent intent was directed toward the Plaintiff in an effort to hinder, delay and defraud the Plaintiff in his lawful collection efforts. The Defendant's false statements, made to the Plaintiff's counsel concerning his income and ability to make payments toward his judgment debt, were a part of the same overarching objective.

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

That is activity that took place prior to the Defendant filing his bankruptcy case. But § 727(a)(4) is not directed at prepetition activity, it is specifically directed toward activity that takes place "in or in connection with" the bankruptcy case. 11 U.S.C. § 727(a)(4). That is where the Defendant's non-disclosure comes in. The Defendant failed to either declare the funds in the account as his property (jointly owned with Maureen) on his Schedule B or to declare the account in Item 11 of his Statement of Financial Affairs as a pre-petition transfer.

In the end, the Court finds, by a preponderance of the evidence, that the Debtor's failure to disclose his interest in the Premier Account was knowing and willful. Schedule B requires the debtor to list "all personal property of the debtor of whatever kind." A debtor's duty to list property is clearly not restricted to only property in which the Debtor owns legal title. The language at the top of the form instructs that "[i]f the property is being held for the debtor by someone else, state that person's name and address . . .." Alternatively, it may have been listed in Item 11 of Defendant's Statement of Financial Affairs. That item does not, as the Defendant argues, relate only to accounts that are closed. The language is expansive. It includes accounts owned by the debtor as well as those "held for the benefit of the debtor." It does not include only closed accounts but those that were "closed, sold, or otherwise transferred."

The Court finds that the close proximity of the Defendant's use of the Premier Account to his bankruptcy filing is strong evidence that the failure to disclose was not accidental. The Defendant's use of the Premier Account was not remote from the bankruptcy filing. The evidence discloses continued use of the account from the time he removed his name from the title of the account at least up to the filing of his bankruptcy case. Defendant's non-disclosure of the Premier Account on his schedules is merely a continuation of his prepetition use of the Premier Account to hide assets from his creditors.

The Court finds that the non-disclosure of the Defendant's interest in the Premier Account was material. Arguably, the Defendant's money that went into the Premier Account went out just as fast to defray customary living expenses. There is no evidence that substantial funds were allowed to accumulate in the account. Had the Defendant's interest in the Premier Account been disclosed in his schedules, there is no certainty the trustee would have sought turnover of the Defendant's interest in the account and any such recovery for the benefit of the estate would have been modest. Yet, the measure of materiality is not the extent to which the estate would have benefitted from the disclosure. When the failure to disclose involves an asset of the estate – any asset of any value – the failure to disclose is material. *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990) ("[A] 'recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted . . . information concerned a worthless business relationship or holding; such a defense is specious.'") (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

The Court finds that, under 11 U.S.C. § 727(a)(4)(A), the Debtor has made a false oath in his bankruptcy case by failing to disclose his interest in the Premier Account. His false oath was

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

material and was done knowingly and with fraudulent intent. Accordingly, the Defendant's discharge will be denied.

The result the Court reaches today is harsh. Yet it is a reflection of the absolute requirement of full disclosure that underpins the operation of the Bankruptcy Code.

Defendant's non-disclosure of his interest in the Premier Account has caused little or no diminution of assets available for distribution from the bankruptcy estate. But, harm to the estate is not a necessary element to liability under 11 U.S.C. § 727(a)(4)(A). To be sure, the value of a undisclosed asset is always a relevant factor in a court's analysis of the surrounding facts and circumstances. The less the value of a concealed asset, the more likely a court is to regard the omission as an honest mistake. In many cases, it is reasonable to infer that the debtor has less motive to conceal an asset of little value. In this case, the pre-petition pattern of concealment of the Defendant's interest in the Premier Account was a pivotal factor in the Court's finding of knowing and intentional non-disclosure. The Defendant used the Premier Account to deposit his payroll checks and he concealed his interest in those funds by removing himself from title to the account. A finding of no liability under § 727(a)(4)(A) would transmute a knowing and fraudulent concealment of the Defendant's interest in the account that continued virtually up to the petition date into an honest mistake. That is not an inference supported by the evidence.

*2) The Travel Trailer*

The Plaintiff also argues that the Defendant made a false oath by mischaracterizing his relationship with Maureen McDonough at the time that he filed his bankruptcy petition. On the petition date, he claimed that he was separated from Maureen and living in a travel trailer at an RV campground. He had equity in the travel trailer and, by virtue of his claim that he lived in the trailer on the petition date, he claimed the trailer as his exempt homestead and his claim of exemption was not challenged. Debtor's schedules indicate that he has nearly $14,000.00 of equity in the trailer. Absent the homestead exemption, it is an asset that would likely have been liquidated for the benefit of creditors.

The timing is suggestive. Debtor claims to have taken up residence in his travel trailer just weeks before filing his bankruptcy petition. He returned to Maureen's home about four months later. Also suggestive is the fact that living at the campground on the petition date allowed Defendant to plausibly claim an exemption in an asset of value that otherwise would have been liquidated by the estate. But we have third-party testimony from the campground manager and from Sharon Seymour that Defendant was living at the campground. We have no evidence he was actually living with Maureen during that time period. It is also clear from the evidence that the Debtor's relationship with Maureen was characterized by occasional separations. The weight of the evidence on this point favors the Debtor and does not provide grounds for denial of discharge under § 727(a)(4)(A).

ORDER ON PLAINTIFF'S SECOND AMENDED COMPLAINT
Adversary No. 11-1233 HRT

E. Denial of Discharge under 11 U.S.C. § 727(a)(5) for Failure to Account for Assets

The court shall grant the debtor a discharge, unless–

. . .

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . ..

11 U.S.C. § 727(a)(5).

Finally, the Plaintiff argues that the Defendant has failed to account for the loss of his assets. The Plaintiff's focus is not on the Defendant's failure to account for particular assets but it is on the Defendant's income. The essence of Plaintiff's argument is that, given the amount of the Defendant's pre-petition income, he should have more to show for it. The argument goes more to the Defendant's general profligacy than it does to an actual loss of tangible assets. The evidence does not support denial of discharge under § 727(a)(5).

### III. CONCLUSION

In accordance with the above discussion, it is

**ORDERED** that Judgment shall enter in favor of Plaintiff, Martin J. Wagner, and against Defendant, William Philip Wagner, n/k/a William Philip McDonough, in the principal amount of $100,000.00 together with interest to date of $48,126.03 for a total judgment amount of $148,126.03 plus continuing interest at the rate of 4.95% per annum until paid in full plus costs. The parties are responsible for their respective attorneys' fees. Such Judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A). It is further

**ORDERED** that, under 11 U.S.C. § 727(a)(4), the Debtor's DISCHARGE is hereby DENIED.

Dated this 30th day of April, 2013.

BY THE COURT:

*Howard Tallman*

Howard R. Tallman, Chief Judge
United States Bankruptcy Court